UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 15-49 (3) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION<br>ON SENTENCING |
| ADNAN ABDIHAMID FARAH (3), | |
| Defendant. | |

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter, John Docherty, and Julie Allyn, Assistant United States Attorneys, submits the following position on sentencing. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of 15 years' imprisonment and a lifetime of supervised release is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

I.     INTRODUCTION

Defendant Adnan Abdihamid Farah has pled guilty to Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B.   The evidence in the case showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight for, ISIL – one attempt in the Spring of 2014 which resulted in two

travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria.  This third attempt was unsuccessful, and resulted in the arrest of six of this case's defendants.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation prepared by the United States Probation Office.  The evidence in this case shows that Adnan Farah was committed to joining, fighting, and killing for ISIL from the inception of the conspiracy in the spring of 2014 until it was brought to an end by law enforcement's intervention on April 19, 2015.

Several men from Minnesota have died in Syria as a result of the conspiracy of which defendant Guled Omar was a part.  Other men from Minnesota have reached Syria, and are active members of ISIL, a dangerous international terrorist organization which threatens the national security of the United States.  The defendant lied to his family, he lied to the FBI, and he lied to a federal grand jury on two occasions.  To protect the public from the danger which the defendant poses, to provide just punishment, and to deter others from joining foreign terrorist organizations, the 15-year sentence recommended by the government is appropriate.

## II.   THE CASE AGAINST ADNAN ABDIHAMID FARAH

### A.  Defendant Adnan Farah's Role in the Spring 2014 Plot to Join ISIL

When the now-deceased Minnesota-based ISIL fighter Hanad Mohallim ("Mohallim") left the United States to join the designated terrorist organization in March of 2014, it provided inspiration to the defendant and others in the conspiracy. Abdullahi Yusuf (hereinafter "Yusuf") testified that in March of 2014, as he searched for his friend Mohallim, Adnan Farah told him not to worry, because Mohallim was "*chasing Jannah.*"[1]

Yusuf testified that later that night, he and Defendant Adnan Farah were joined by co-defendant Guled Omar. The three men discussed travel to Syria over dinner and Omar shared his own experiences getting stopped at airports and subsequently dealing with the FBI. *Yusuf 5/13/16, Tr. ps. 44-45.* Adnan Farah, Yusuf and Omar then went to a local mosque where they met co-conspirators Abdurahman, Warsame, Mohamed Farah and Daud. After playing basketball, this group discussed Syria and watched an "anti-West" and pro-ISIL propaganda channel on Youtube called *Enter the Truth*. This channel provided access to numerous videos that depicted the West as the enemy of good Muslims and urging the viewer to make *hijrah*[2] to join the Islamic State. *Id, ps. 47-51.*

Yusuf testified that he later obtained Mohallim's Kik handle in Syria and that he provided the contact information to Defendant Farah who was "*happy to hear*" that Yusuf was in contact with this ISIL fighter. *Yusuf 5/13/16, Tr. p. 100.* Also during this time,

---

[1] Seeking paradise or heaven. *Yusuf 5/13/16, Tr. 40.*
[2] *Hijrah* means a migration or journey to Muslim lands.

Farah cast his vote for Omar to be elected *emir* of the group who, now inspired by Mohallim's success, were actively planning travel to Syria to join ISIL. *Id.*

In furtherance of the conspiracy, Defendant Adnan Farah applied for an expedited passport on April 25, 2014, using money he received from Warsame.   PSR, ¶ 27. Defendant Farah lied to federal authorities, asserting on his passport application[3] that he intended to travel to China when Defendant Farah fully intended to join co-defendants Yusuf and Abdi Nur for their end-of-May departures to Syria. *Plea Agreement, p. 2.* Farah's passport arrived in the mail much sooner than he had anticipated, thereby allowing his parents to confiscate the document.  This, in turn, prevented Adnan Farah from joining Yusuf and Nur in their efforts in late May of 2014 to join ISIL in Syria.  PSR, ¶ 28.

### B.  Defendant Adnan Farah's Ongoing Participation in the Conspiracy

Defendant Adnan Farah was not deterred by the fact that his parents confiscated his passport and suspected his criminal intentions.   Instead, Farah continued to participate in the conspiracy.   For example, the defendant attended paintball sessions with co-conspirators which he acknowledged were training sessions for combat.  PSR, ¶ 152. Defendant Farah consumed radical ISIL propaganda, including the lectures and teachings of the radical sheikh Anwar Al-Awlaki.  PSR, ¶ 150.  During this time, Defendant Farah's Facebook profile presented both Al-Awlaki's image and that of a mujhadeen pointing a large-caliber sniper rifle over the phrase *"among the believers are men who have been true to the covenant with Allah."* PSR, ¶ 75.  Those images follow:

---

[3] Trial Exhibit 3, p. 5.





In a statement to probation made after pleading guilty, Defendant Farah would characterize Anwar Al-Awlaki as someone who sent messages about "*helping Muslims in need*." PSR ¶ 151. Contrasting this, however, is the evidence of Anwar al-Awlaki's teachings, taken from the iPod of co-defendant Daud. The video, called <u>Advice To Those Left Behind From Jihad</u>[4], is a forty-five minute goading of the viewer into leaving the comforts of home to engage in violent *jihad* until one's death as a *shaheed*[5] is achieved. Al-Awlaki's propaganda speaks little to nothing of aiding the poor; rather, the sheikh simply and repeatedly exalts dying a violent death for radical Islam. Defendant Adnan Farah acknowledged that that ISIL was not a humanitarian organization, but instead viewed it as one that fought for Sunni Muslims.[6]

Defendant Farah continued to consume ISIL propaganda during the summer of 2014. Farah, as well as his co-conspirators, watched an ISIL video released in July of 2014 titled <u>Upon the Prophetic Methodology</u>.[7] This video graphically depicted the mass executions of young Shia men captured at an Iraqi Security Forces recruitment depot near Tikrit that had been overrun by ISIL earlier in the summer of 2014. The ISIL video shows the execution of hundreds of young men sitting on a concrete pad, their hands bound behind their back; truckloads of Shia victims are filmed begging for their lives and forced to

---

[4] Trial Exhibit 259.

[5] A *shaheed* is a term used to describe one who has achieved martyrdom fighting *jihad*.

[6] In his interview with probation, Adnan Farah acknowledged rejecting the idea that he would joining a humanitarian organization because he believed his people, Sunni Muslims, were being massacred. PSR, ¶ 149.

[7] The video was received into evidence as Exhibit 178.

denounce Iraqi politicians, only to be marched to an open ditch where they are shot in the head as ISIL's ubiquitous black flag is seen blowing in the wind strategically within the camera's viewfinder.  At the close of this video, dozens more captives were paraded to the edge of the Tigris river, unceremoniously shot in the head, then pushed into its green waters.  PSR, ¶ 81.

### C. Defendant Farah Obstructed the Grand Jury Investigation in June 2014

Defendant Farah furthered the goals of the conspiracy during the summer of 2014 by obstructing a grand jury investigation into the conspiracy.  PSR, ¶ 41.  In the aftermath of Nur's successful departure to Syria and Yusuf's attempt to leave the U.S. in late May 2014, Defendant Farah was subpoenaed to a federal grand jury sitting in the District of Minnesota.  At his June 18, 2014 appearance, Adnan Farah acknowledged his right to counsel and his right to remain silent.  He was cautioned about lying to a federal grand jury and he was informed of the potential consequences.  In an effort to protect himself from federal prosecution, to protect his co-conspirators from prosecution, and to protect the opportunity for all members of the conspiracy to join ISIL in the future, Adnan Farah then proceeded to repeatedly lie to the grand jury.

Among many topics, the defendant falsely testified that:  a) he knew no one who had traveled to Syria; b) he had not spoken with Omar about Nur's travel to Syria; c) he had no advance knowledge of Nur's plans to travel to Syria or his motive for going to Syria; and d) he obtained his own passport in April of 2014 for travel to China.  Had Defendant Farah been truthful, the grand jury would have been in a position to better assess the scope of the conspiracy, including Farah's role in planning and in aiding his co-conspirators'

travel to join ISIL.  However, by intentionally misleading the grand jury, Farah avoided inculpating himself, Nur, Yusuf, Omar, Mohamed Farah, Daud and other members of the conspiracy involved in the on-going plot to join, fight and kill for ISIL.

### D.  Defendant Adnan Farah's Role in the Fall of 2014 Plot to Join ISIL

The defendant acknowledged in his guilty plea that throughout the summer of 2014, he attended meetings with his co-conspirators to discuss continued plots to join ISIL.  Plea Agreement, ¶ 2, p. 2.  In a March 3, 2015 recording, Omar described this phase of the conspiracy in great detail to Bashir and in doing so, identified Defendant Adnan Farah as one of its participants: "*[a]lright, first day we were at Ikhlas [mosque].  It was me, Daud, and Musab, M-dot[8], **Adnan**, Hanad Musse, (unintelligible) at Ikhlas[9], all talking about how we're going to [Syria]*."  Omar told Bashir that Adnan Farah and Daud had discussed stealing the passports of other Somali males to use in their effort to leave the country: "*[Daud is] like 'Yo, **Adnan Farah**, what we gonna do?  We gonna steal Abdishakur and them's passport.  We gonna steal their passports and go through Cali and then leave right away'*."  Id.

In September of 2014, the defendant took a job at a temporary employment agency with several of his co-conspirators to earn money to finance their next attempt to join ISIL.  PSR, ¶¶ 43, 194.  While at a mail processing facility, the group discussed plans to travel to Syria to join ISIL and they consumed ISIL propaganda.  *Bashir 5/19/16, Tr. ps. 61-65.*  As Omar would confirm on tape, "*[w]hen we were working at Doherty everything was*

---

[8] 'M-Dot' is a nickname for Mohamed Farah.
[9] 'Ikhlas' is a reference to the Al-Ikhlas Mosque in Northeast Minneapolis.

*going perfect…We were working, the kuffar were not, they didn't even know we worked together, they didn't even know nothing, bro."*[10]

Members of the conspiracy continued to meet well into the fall of 2014. Bashir testified that Defendants Adnan Farah, Abdurahman, Daud, Mohamed Farah, Musse, and Omar had attended "tawheed meetings" during this time.  At these meetings, the conspirators discussed the "oneness" of Islam, ISIL's latest propaganda videos, events in Syria, as well as novel methods of travel into Syria to join ISIL.  *Bashir 5/19/16, Tr. ps. 68-69.*  In September, Defendant Adnan Farah was present at one such meeting where Yusuf, having just received a tip leading him to believe he was about to be arrested for his failed May 2014 attempt, shared his concern with Defendant Farah and the others in the group.  Defendant Farah responded by encouraging Yusuf to leave for Syria immediately.  *Yusuf 5/13/16, Tr. p. 190 - 191*.  Thereafter, Defendant Farah, Yusuf and several others accelerated their planning for an imminent departure from the U.S. to join ISIL.  PSR, ¶ 48.

During this phase of the conspiracy, both Defendants Adnan Farah and Daud were in contact with a known ISIL fighter named Abu Antar, and they passed on to the group information gleaned from this ISIL member that would assist them in getting to Syria.  For example, Adnan Farah and Daud relayed that Abu Antar was attempting to arrange for a person to make fake passports for them, and was also providing information on how to get from Turkey into Syria.  *Yusuf 5/16/16, Tr. p. 25*.  Yusuf observed that the role played for the group by ISIL fighter Abu Antar in the fall of 2014 was similar to the role played by

---

[10] Trial Exhibits 203 (audio) and 204 (transcript, p. 125)

Mohallim previously in the spring of 2014.   Adnan Farah was also in contact with ISIL

fighter Abdi Nur during this time period.   Plea Agreement, ¶ 2, p. 3.

Adnan Farah plotted with the group to make another attempt to join ISIL, but the

evidence showed that the process did not work seamlessly, in part because of Defendant

Adnan Farah's haste to join ISIL.   Omar would later recount how, during the fall 2014 plot,

he scolded Defendant Farah for making plans with Daud to join ISIL when there was a

designated *emir* responsible for vetting the group members' schemes: *"'you gave ba'yah*

*[a pledge of loyalty] to an emir, and you told him {the thing}[11].   You gonna inform him*

*about everything, and he was going to make all the decisions.'*   **Adnan** *felt bad."*   Omar

also described the aftermath of the friction created within the group: "***Adnan***, *{he said,}*

**'I'm leaving on my own, I'm leaving right now.'**   *He left his house.   I had to pick him up*

*from (UNI).   Remember that day I was calling you?   I was like, '[Bashir], I gotta pick up*

*Mohamed Farah,* **Adnan**, *downtown. They took their passports.   They said F-you to their*

*parents.'   So basically like, 'we're leaving tomorrow' type shit."*[12]

Later in the same conversation, Omar explained that Defendant Farah's role

included convincing Ahmed to join the JFK Four, rather than travel with Omar as originally

planned:  "*And then Hamza got into the situation* **because Adnan brought Hamza into the**

**situation**. *Hamza wanted to go with me.  ...Because I remember when me and Hamza came,*

*when we became friends, you know?   That was our plan.*   **But Adnan somehow like, he**

---

[11] Material in curved brackets has been translated into English from a foreign language, usually either Somali or Arabic.
[12] Trial Exhibits 197 (audio) and 198 (transcript, p. 28).

*somehow convinced him like you know, 'Come with us.'*[13]   Adnan Farah's active role in getting co-defendant Ahmed to join the JFK Four, rather than travel overseas *via* Mexico with Omar, is further supported by a statement made by the defendant's brother, Mohamed Farah[14]:

> GO:   *That's when I found out Hamza [Ahmed] was leaving with them. I was planning on Hamza coming with me. I already told Hamza. I was like, "Hamza, listen (UNI)." I told him to get a flight. Go to, take your flight. When you get to California, wait for me there.*
> UM:   *What did he say?*
> GO:   *When you wait for me there, we're gonna cross the border together. (UNI) I think Adnan told him, {got in his head}.* **Somebody {got in his head.}**
> MF:   **It was Adnan.**

Bashir's trial testimony further illuminated Defendant Adnan Farah's role in the November 2014 plot. Bashir testified that he would first learn of the fall 2014 plot not from the co-conspirators in Minnesota, but rather from Mohallim and Nur who were both on the ground in Syria fighting for ISIL. *Bashir 5/19/16, Tr. p. 98.* Bashir then confirmed the existence of the plan with Abdurahman, which was followed by a meeting with Defendants Adnan Farah, Daud and Abdurahman. *Bashir 5/19/15, Tr. 101-05.* In this meeting, Adnan Farah and Daud confirmed the impending November 8th departure date. Adnan Farah told Bashir that he was planning to get money for travel from co-conspirator Hamza Ahmed.[15]   Bashir, who also needed money to travel, then called Ahmed who, in turn, drove to their location and joined the meeting. Once in the company of the

---

[13] Trial Exhibits 197 (audio) and 198 (transcript, p. 28).
[14] From February 17, 2015 CHS recording - trial exhibits 189 (audio) and 190 (transcript).
[15] This fact was corroborated by Ahmed himself during his change of plea before this Court on April 25, 2016. In his guilty plea to conspiring with Defendant Adnan Farah and others to provide material support to ISIL, Ahmed testified that he gave a portion of his federal financial aid to Adnan Farah to help him travel to Syria. *Ahmed plea transcript, p. 44.*

11

conspirators, Ahmed confirmed that he had extra funds, but said he needed to consult with Omar before committing the money. *Id.* Ultimately, Defendant Farah would not join the JFK Four in their attempt on November 8, 2014; not for lack of desire, but rather as a direct result of his parent's maintaining control over his passport. PSR, ¶ 49.

Shortly after the JFK Four were stopped by law enforcement, the group of conspirators – including Adnan Farah – met at the Dar al Farooq Como mosque in Minneapolis to discuss the status of their criminal efforts. The group discussed how they were sent back from JFK, what they should have done (e.g. split up the foursome with two leaving from Milwaukee and two from Boston), and what to do going forward – to include avoiding social media. *Bashir 5/19/16, Tr. ps. 113-14.* PSR, ¶ 64.

### E. Defendant Farah Obstructed the Grand Jury Investigation – January 2015

Defendant Farah was summoned to appear before the grand jury a second time on January 22, 2015, in response to the JFK Four's attempt from November of 2014. PSR, ¶72. After another advice of rights and another caution regarding perjury, Defendant Adnan Farah once again opted to lie to the grand jury. This time, he testified falsely that a) he had no advance knowledge of the four JFK-bound co-conspirators' attempt to join ISIL in November of 2014; b) he had no conversations with the four co-conspirators about their attempt after it had taken place; c) that if he had knowledge about the November plot, he would tell the grand jury about it; and d) he knew no one who was in communication with ISIL fighter Abdi Nur. All of the defendant's lies were designed to protect himself and his co-conspirators, and to keep the goals of the conspiracy (the group members' successful travel overseas to join ISIL) alive.

Based upon intelligence they obtained directly from ISIL fighters overseas, from watching countless ISIL propaganda videos, from watching the news, and from the application of common sense, the defendant and his co-conspirators knew what to expect once they made it to Syria or Iraq. That is, these men expected be on the battlefields of Iraq and Syria fighting and killing on behalf of ISIL in its quest to create a so-called caliphate.

### F. Defendant Adnan Farah's Role in the Spring of 2015 Plot to Join ISIL

"*If we don't take advantage of this, we're stupid*." – *Adnan Farah, on March 16, 2015. (PSR, ¶ 99)*

As set forth above in the description of the offense, Defendant Adnan Farah had twice sought to leave Minnesota to join ISIL during 2014. Despite failing in the spring of 2014, and again in the fall of 2014, the evidence shows that he was undeterred and would try yet again in 2015. Knowing that he was being watched by federal authorities and that his parents still held his passport, Defendant Farah signed on to the plan to obtain fake passports to use to leave the U.S. and join ISIL. *Plea Agreement, ¶ 2, ps. 3-4.* As he had done in both the spring and the fall of 2014, Adnan Farah attended meetings in the winter and spring of 2015 to discuss the group's next effort to join ISIL. PSR ¶¶ 99 and 100. Defendant Adnan Farah provided a down-payment for his fake passport, he gave co-defendant Musse's photograph to Bashir for Musse's fake passport, he participated in discussing the logistics of acquiring his fake passport (to include sending his passport photograph hidden in the soles of a shoe or under a different name, or wiring money for

payment using a different person's name)[16], he sought funds for his own travel, he acted as a conduit for information about the conspiracy, and he provided encouragement to others to commit this crime.

Defendant Adnan Farah recognized that what had failed members of the conspiracy in the past had to be avoided for success going forward. The defendant observed: *"[w]e can't be making dumb decisions like we always do. Rational decisions. We gotta be smart about transportation. We was even thinking about trucks. Talk to one the truck drivers. And pay him.*"[17] Defendant Farah also expressed dangerous resolve to accomplish the goals of the conspiracy in the face of persistent surveillance by the FBI: *"[b]ro, I don't give a shit. If we get stopped nigga, I'm carrying, I'm a get a pistol wallahi. I'm gonna get it off the street…Because these dudes [the co-conspirators] get stopped every day….[I swear to god]. Zach and them get followed."*[18]

The defendant was also a key conduit for information about the conspiracy to his close friend and co-defendant, Daud. One example of this can be found in a recording[19] in which Defendant Farah is heard telling Bashir that he [Farah] had just informed Daud about the new fake passport contact in California. This passing of key information by Adnan Farah was confirmed by Daud himself when, later that evening, Daud first spoke to Bashir about the passport contact: Bashir asked Daud *"you filled in, yeah?"* to which Daud replied, *"[y]eah man. That's like the best news I heard…like I heard in years, bro."*

---

[16] PSR, ¶ 100.
[17] Exhibits 208 (audio) and 209 (transcript, p. 23).
[18] Exhibits 208 (audio) and 209 (transcript, p. 12).
[19] Exhibits 210 (audio) and 211 (transcript, p. 52).

That Defendant Farah knew just how serious their plot was cannot be questioned. Indeed, when Farah asked Bashir about what his Canadian cousins knew about their plot, he inquired: *"[y]ou told them we in some deep shit?"*[20]  The defendant also recognized the legal risk that he and the others were taking, as evidenced in his comment to other conspirators, "…*whoever gets locked up, gets locked up*" and *"…[i]t's either we all make it out…Our fate is the same.  We take it all like a man*."[21]  And while contemplating the aftermath of his, and his co-conspirators' departures from Minnesota, Defendant Farah said, "*I'm just saying, eight niggas missing from Minnesota, that's the thing, bro.  **That's a world hunt**, that's a hunt, that's a hunt.*"[22]

As the 2015 plot moved forward, Defendant Farah was still in search of money for his travel to join ISIL.  Six days before the group's planned departure, Daud confirmed as much, stating "*Adnan is over here trying to look for money*."[23]  On April 14, 2015, a mere three days before their departure to San Diego, Defendant Farah discussed writing a letter to a mosque for money for joining ISIL: "*should I write a fake letter?*"[24]  Defendant Farah also told Bashir to ask Bashir's cousins in Canada to "*add a extra one-thousand, one-five [$1500]*" for his travel.[25]

---

[20] Exhibits 210 (audio) and 211 (transcript, p. 22).
[21] Exhibits 210 (audio) and 211 (transcript, p. 16).
[22] Exhibits 208 (audio) and 209 (transcript, p. 17).
[23] Trial Exhibits 243 (audio) and 244 (transcript, p. 15).
[24] Trial Exhibits 245 (audio) and 246 (transcript, p. 71).
[25] Id. at p. 84.

### G. The Defendant Agreed to Postpone His Attempt to Join ISIL to Preserve the Viability of the Conspiracy

*"By Ramadan, I'll be in Turkey."* – Defendant Adnan Farah, April 17, 2015

The evidence established that one day before the April 17th departure to San Diego, Defendant Adnan Farah agreed to stand down and wait his turn for another opportunity to join ISIL. On April 16th, still short on money for travel, Defendant Farah spoke directly with ISIL fighter Abdi Nur who told him to be patient, and that his time would come. As reported by co-defendant Daud in an April 17th recording:

> ***Adnan, he's the only guy that was with me the whole time***, *{you remember?}* ***He understands bro***. *And he wants, and he knows what the—what the deal is right now. He's so cool wallah. He's telling Abdi,* ***Abdi was telling him last night***. *Just they—they were just t—talking, I let him talk. He said,* ***"{Man} your time is going to come bro***. ***And he's like, "Yeah, I know. I'm not tripping***."[26]

Daud further confirmed that he and Mohamed Farah had "***told [Adnan] to stay***". When Bashir asked why they had done so, Daud explained, *"**[Adnan's] dad told him he is gonna take him to Africa**. At the same time…me and Mohamed…If we was to leave, no one is ever gonna come after us, you know*."[27]  Daud explained further to Bashir that the Farah brothers' mother treats her two sons differently: *"…Adnan, bro, his mom . . . You don't understand. Me and Mohamed know how…Ayan [Farah] is about Adnan."*[28]  Thus, co-defendants Daud and Mohamed Farah believed that their departure to Syria would bear less risk without Adnan Farah given the heightened supervision of Adnan Farah by his mother, Ayan.

---

[26] Trial exhibits 253 (audio) and 254 (transcript, p. 29)
[27] Trial transcripts 251 (audio) and 252 (transcript, p. 20).
[28] Id.

16

After the men decided that it was best for the defendant to postpone, Defendant Adnan Farah, asked Daud and Mohamed Farah to "Kik" him the contact information for Abu Harb, a known ISIL fighter.  Adnan Farah also assured his co-defendants, "*that I'm going to see if I can get a Somali passport. If I can get a Somali passport inshallah by Ramadaan I should be in Turkey. In Somalia that's all for—that's only [UI]. I should be in Turkey*.[29] The defendant had planned to fly to Somalia with his father, then travel to Turkey where he could meet his co-conspirators.   Co-conspirator Daud even confirmed Defendant Adnan Farah's plan: "*[Adnan's] dad is trying to get Abdifatah[30] and [Adnan] the passports on Monday*."[31]

As Daud and Mohamed Farah drove to San Diego to pick up their fake passports, Daud discussed Adnan Farah being his "*information guy*" once the co-conspirators arrived in Syria.[32]  Expressing a high level of trust in the defendant, Daud suggested calling Adnan Farah to gauge how law enforcement was reacting to his and Mohamed Farah's disappearance from Minneapolis: "**I feel like we should call Adnan…he's not going to tell nobody**."[33]

### H. Defendant Adnan Farah's Post-Plea Statements

The defendant has made numerous statements in a variety of contexts since he entered his guilty plea before this Court.  In each case, however, Farah has downplayed what he has done and he has attempted to engender sympathy with self-serving versions of

---

[29] Trial exhibits 256 (audio) and 257 (transcript, p. 9).
[30] Abdifatah Farah is Defendant's younger brother.
[31] From Trial exhibits 251 (audio) and 252 (transcript, p, 20)
[32] From Trial exhibits 256 (audio) and 257 (transcript, p. 69)
[33] Id.

his involvement in the conspiracy.  Further some of these post-plea statements are inconsistent with each other – evidencing that at least one of his versions is untrue.  Farah has talked with the probation officer, he has talked with the Court's expert Daniel Koehler, and most recently, he granted a series of interviews with a reporter from a local news outlet. In each of these statements a distinct pattern emerges: that of a man attempting to minimize and excuse what he has done, as well as someone attempting to elicit sympathy where none is due.  And ultimately, these statements suggest that Adnan Farah has not accepted the seriousness of what he has done.

### The Defendant's Statement to Probation

While not denying that he conspired to join a brutal terrorist organization,[34] Adnan Farah told the probation officer that he was motivated to go to Syria in the first instance to "*help Muslims in need*."  PSR, ¶ 151.  In response to the fact that he knew ISIL committed atrocities such as beheadings and burnings of unarmed Shia prisoners, the defendant simply reported that "*he was not looking with "open eyes.'*"  PSR, ¶ 152.  Inexplicably, the defendant told the probation officer that he "*never took steps*" to leave the country after his parents confiscated his passport in 2014.  PSR, ¶ 155.  The undisputed evidence in the record establishes, however, that Adnan Farah in fact took ***many*** steps to leave the country, even after his parents took his passport in April of 2014.  With probation, Adnan Farah has

---

[34] Though it is the government's position that these post-plea statements reflect a troubling lack of candor, the government will continue to recommend that Adnan Farah receive the reduction in offense level for acceptance of responsibility.

also tried to paint himself as a follower.[35] Notably, however, Defendant Farah earlier evidenced a firm sense of self and independent thought regarding his participation in the conspiracy.  For example, on April 9, 2015, when he, Mohamed Farah, and Bashir discussed who was 'in' and who was 'out' of the plot, Defendant Farah maintained that Omar had no influence on him: *"He talks to me every night. He doesn't have an effect on me bro…It doesn't matter to me, bro.* **I think for myself,** *bro."*[36]  While Adnan Farah admitted the elements of the conspiracy charge to probation, he failed to reflect candidly on his actual conduct and his real motivations; to wit, to join and do the work of a highly criminal terrorist organization.

### The Defendant's Statement to Daniel Koehler

In a similar vein, Adnan Farah told de-radicalization expert Daniel Koehler that the human rights abuses had "*captured his heart*" which led him to ISIL who, according to Farah, was portrayed as an organization "*giving aid to those in need*."  The defendant explained that the atrocities committed by ISIL were "*a small thing*" compared to the need help the oppressed.  Contrary to what he would later tell a reporter, Farah claimed to Koehler that he had argued *against* the propriety of the beheadings and burnings ISIL was committing.  The defendant also told Koehler that he played a "*minor role*" in the conspiracy, that he "*never really tried to leave*", and that he "*deliberately chose to stay behind.*"  Koehler Assessment, p. 4.

---

[35] Adnan Farah noted specifically to the probation officer that most of the defendants were older than him and that he looked up to his brother, which, according to the defendant contributed to his decisions.  PSR, ¶ 155.
[36] Trial Exhibits 241 (audio) and 242 (transcript, p. 35).

### *The Defendant's Statements to Reporter*

Adnan Farah also chose to speak with a reporter from a local news station.  The station ran a series of reports on the defendant's case, which included recorded statements he made to the reporter over a jail telephone.  In the second installment airing on October 30, 2016, Adnan Farah told the reporter that "*I was so far gone into [ISIL's] propaganda that I believed that [beheadings and burnings] were right*."  Candid as that statement may have been about his state of mind during the conspiracy, it is contrary to what he earlier had told Koehler, which was that he had supposedly argued with his co-conspirators *against* those very atrocities.  *See* Koehler Assessment, p. 3.

This self-serving account fails to find any support in the evidence.  For example, Defendant Farah (as well as several other defendants facing sentencing) spoke of the Assad regime's child-victims as a motivating factor for their desire to travel to Syria, yet the only reference to children in the dozens of hours of recordings is his co-defendants' admiration of the children being trained by ISIL to engage in combat.[37]  In the same vein, each ISIL video in evidence showcases only the brutality of ISIL fighters, their supposed combat prowess, the perceived glory of martyrdom, and the claimed righteousness of establishing a so-called Islamic State.  Defendant Farah himself participated in conversations about where they would be fighting for ISIL and the prospect of becoming a martyr.  For example, on March 23, 2015, the defendant was engaged in a discussion with Daud, Mohamed Farah, and Bashir about whether fighting for ISIL in Kobane would be worse than fighting for

---

[37] Trial Exhibits 232 (audio) and 233 (transcript, ps. 195-96).  During this portion of the recording, Daud and Mohamed Farah discuss favorably an ISIL propaganda video that depicts children from Kazakhstan training for combat under ISIL's tutelage.

ISIL in Iraq.[38]  Adnan Farah himself discussed the fact that the location where Mohallim and the Karie brothers were killed fighting for ISIL near Kobane is rumored to glow at night: *"[w]here they got shahada[39] lights up."*[40]  Further, as described above, his Facebook page presented images glorifying a radical sheikh and projecting violence in the name of Islam.  No starving children.  No down-trodden Muslims.

Though he has not denied the elements of the crime to which he has pled guilty, Adnan Farah has endeavored to minimize his involvement in a way that the evidence simply does not support.  In these post-plea statements, Defendant Farah, like many of his co-conspirators, absurdly cast his participation in the conspiracy in terms of a humanitarian mission gone astray.  He, like other defendants in this case, ultimately attempt to assign nobility to his criminal intent where it ought not belong.

### III.    THE REPORT OF PRESENTENCE INVESTIGATION

#### A.  Factual Statements in the PSR

The United States has no objections to the factual assertions in the PSR.

#### B.  Sentencing Guidelines Calculations in the PSR

The PSR calculates a base offense level of 26.  The United States concurs that the terrorism adjustment of U.S.S.G. § 3A1.4 applies, resulting in a 12 level increase in offense level and a criminal history of Category VI.  Consistent with the plea agreement in this matter, the United States is not seeking application of a two-level increase for obstruction of justice under Section 3C1.1.   The PSR calculates a total offense level of 37 with a

---

[38] Trial Exhibits 214 (audio) and 215 (transcript, ps. 65-67).
[39] *Shahada* means martyrdom.
[40] Id. p. 185.

criminal history category of VI.  The parties contemplated a total offense level of 35 with

a criminal history category of VI.   The 2-level adjustment for obstruction of justice has no

practical effect because whether or not the increase is applied, the guidelines sentence

remains 180 months due to the statutory maximum sentence of 15 years for the offense of

conviction.

### IV.   THE COURT SHOULD SENTENCE THE DEFENDANT TO IMPRISONMENT FOR FIFTEEN YEARS.

> "…*Whoever gets locked up, gets locked up…It's either we all make it out…Our fate is the same... We take it all like a man*." – Adnan Farah, March 16, 2015[41]

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the

appropriate sentencing methodology: the district court calculates the advisory Guidelines

range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to

determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,*

561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first

determine the appropriate Guidelines range, then evaluate whether a traditional departure

is warranted, and finally decide whether or not to impose a guideline sentence after

considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but

instead "must make an individualized assessment based on the facts presented."  *Id.* at 50.

If the court determines that a sentence outside the Guidelines range is called for, it "must

consider the extent of the deviation and ensure that the justification is sufficiently

---

[41] Exhibits 210 (audio) and 211 (transcript, p. 16).

compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

## A.  Nature and Circumstances of the Offense

The nature and circumstances of the offense are set forth in detail in Common Appendix A.  The defendant stands convicted of conspiring to provide material support to the designated foreign terrorist organization known as ISIL.  The organization he sought to assist is one of the most dangerous and violent in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Antwerp, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.

As has been discussed in this sentencing position paper, the loss of life in this conspiracy, both among conspirators who have been killed and innocent victims of terrorist acts, has been immense.  The threat to the national security of the United States has been grave.  The seriousness of the defendant's criminality is a reason for a lengthy term of imprisonment in this case.  *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

## B.  History and Characteristics of the Defendant

The defendant is 20 years old.  He was born and raised in America.  He attended public schools in America and he has no criminal record.  Despite this benign posture,

Adnan Farah endeavored to join a terrorist organization the likes of which the world has not encountered before in terms of its ability and willingness to inflict death and destruction and in the calculated promotion to the world of its violent acts. From attending meetings in March of 2014 to agreeing to stand down one day before his co-conspirators drove to San Diego in April of 2015, Adnan Farah was committed to joining, fighting and killing for ISIL.

Throughout the conspiracy, Adnan Farah engaged in a single-minded pursuit of travel to join this criminal organization. The facts bear out that Defendant Adnan Farah tried three separate times to travel to Syria to join ISIL. The defendant twice lied to a federal grand jury investigating the conspiracy. He consumed horrific propaganda and was only spurred on to again try to join the ranks of ISIL, he convinced a co-conspirator to join the group leaving for Syria from JFK in November of 2014, and he discussed arming himself during the pendency of the conspiracy. Despite the intervention of the FBI, despite the arrests of his co-conspirators, despite his family's knowledge of his intentions, despite the deaths of co-conspirators in battle overseas, and despite knowing that he, himself, would take up arms against other Muslims and kill them – most likely in a most inhumane fashion – Adnan Farah chose to pursue terrorism above all else, including his family and community.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The defendant stands convicted of an extremely serious crime. Considering the seriousness of this crime, promoting respect for the law and providing just punishment are

important factors in this case. As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010).

Further, although the defendant is a young man with no criminal history, Adnan Farah's participation in this conspiracy to provide material support to ISIL cannot be viewed as a discrete event, borne out of a rash or youthful impulse. The defendant took deliberate step after deliberate step to provide "material support"; that is, he offered his own self in the service of a deadly criminal terrorist organization and did so while fully aware of the potential consequences for his actions. The defendant was heard on tape stating, **"…[w]hoever gets locked up, gets locked up…It's either we all make it out…Our fate is the same... We take it all like a man."** These undisputed facts indicate that a fifteen-year term of imprisonment is necessary to reflect the seriousness of the defendant's crime and to promote respect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant

In this case, there is a need for both individual and general deterrence. Individual deterrence discourages a defendant from ever committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join *al Shabaab*, and presumably many of those young men are now dead.  Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists.  As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant community support.  General deterrence is necessary to impress upon the greater community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences. A substantial sentence is necessary to deter individuals, like the defendant, from supporting international terrorism.  As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project* at 2725.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of the defendant, was laid out in the Introduction at the beginning of this pleading.  Terrorism, being motivated by fanaticism, is difficult to deter. The effort must nevertheless be made.  However, if deterrence should be unavailing, then a fifteen-year sentence is amply justified as a means of incapacitating the defendant.

Undoubtedly, the most important objective of any government is the physical safety of the people.  Physical safety is the necessary precondition to the exercise of all other rights, such as freedom of expression, of religion, and of the press, to name only a few.

26

Defendant Adnan Farah's plan to join ISIL in May of 2014, his participation in the November 2014 plot to travel overseas to Syria, his preparation to join ISIL in April of 2015, and his participation in all aspects of this conspiracy, including his desire to protect his co-conspirators before a grand jury make Adnan Farah a dangerous individual. A fifteen-year sentence will, if nothing else, incapacitate the defendant for fifteen years during which time it will be impossible for him to hurt anyone else. Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a substantial term of imprisonment would send a clear message to any would-be jihadists that such conduct is not tolerated by the U.S. government.

### E. The Kinds of Sentences Available, the Need to Avoid Disparities, and the Sentencing Guidelines and Related Policy Statements

As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is no counter-radicalization programming offered by the Bureau of Prisons. This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of defendant Musse receiving any programming that will reduce the risk he currently represents to the safety of the public.

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization. *See*, Docket No. 698. A review of the sentences imposed is telling. Of twenty defendants, in fourteen cases where convicted of an 18 U.S.C. § 2339B violation, fourteen of those defendants, or nearly three-

quarters, were sentenced to the statutory maximum term of 15 years' imprisonment.  Only

four of these convictions followed trial; the rest were all the result of guilty pleas.  In short,

courts are imposing the maximum sentences allowed by law in 2339B cases, even when

defendants have admitted to their wrongdoing and initiated the rehabilitative process by

pleading guilty.

     The sentence of fifteen years' imprisonment, requested by the government, is

consistent with the national sentencing pattern in similar cases.  The government is

requesting like sentences for those defendants before this Court who pled guilty to the same

crime, but have not offered assistance to the government.

### V.      CONCLUSION

     For all these reasons, the United States respectfully asks this Court to sentence

defendant Adnan Farah to a term of imprisonment of fifteen years, followed by supervised

release for the rest of his life.

Dated:  November 3, 2016                    Respectfully submitted,

                                      ANDREW M. LUGER
                                      United States Attorney

                                      *s/ Andrew R. Winter*

                                      BY: ANDREW R. WINTER
                                      Assistant United States Attorney
                                      Attorney ID No. 232531

                                      JULIE E. ALLYN
                                      Assistant United States Attorney
                                      Attorney ID No. 256511

                                      JOHN DOCHERTY
                                      Assistant United States Attorney
                                      Attorney Reg. No. 017516X

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime. After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been. When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school. All the boys were tortured, and several of them were killed. Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths. Over the next few days, protests spread to numerous Syrian cities. The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad. The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president. For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa. President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests. U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support. The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building. The United States then withdrew its diplomats from Syria. The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition. For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies. Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization. Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda. With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan. In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

4

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

5

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

6

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them. Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters. Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups. Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier. At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it. These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state. Second, ISIL used its extreme brutality as a recruiting tool. To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam. To publicize its brutal acts, ISIL has proven very savvy at using electronic media. As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history. At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought. As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset. The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time. In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days. So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.     THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

10

catch his flight to JFK. Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego. The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport. Omar arrived at the airport carrying no luggage, and in possession of his passport. He was denied boarding and sent home. After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria. In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York. There, they were met by agents of the FBI and denied boarding. Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents. When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

CASE 0:15-cr-00049-MJD-HB   Doc. 720   Filed 11/03/16   Page 40 of 41

they were all traveling to Europe, by themselves, for vacation. In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day. Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization. The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents. They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur). In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial. Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria. In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL. Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.