```
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                  )
     United States of America,      )   File No. 15-CR-49(3)
 4                                  )             (MJD/FLN)
               Plaintiff,           )
 5                                  )
     vs.                            )   Minneapolis, Minnesota
 6                                  )   November 15, 2016
     Adnan Abdihamid Farah,         )   1:30 p.m.
 7                                  )
               Defendant.           )
 8                                  )
     ------------------------------------------------------------
 9
                     BEFORE THE HONORABLE
10                     MICHAEL J. DAVIS
               UNITED STATES DISTRICT COURT JUDGE
11                   (SENTENCING HEARING)

12   APPEARANCES
       For the Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
13                                  John F. Docherty, AUSA
                                    Andrew Winter, AUSA
14                                  Julie Allyn, AUSA
                                    600 U.S. Courthouse
15                                  300 South Fourth Street
                                    Minneapolis, MN 55415
16
       For the Defendant:          KENNETH UBONG UDOIBOK, P.A.
17                                  Kenneth U. Udoibok, ESQ.
                                    310 Fourth Avenue South
18                                  Suite 5010
                                    Minneapolis, MN 55415
19
       Court Reporter:             STACI A. HEICHERT,
20                                  RDR, CRR, CRC
                                    1005 U.S. Courthouse
21                                  300 South Fourth Street
                                    Minneapolis, Minnesota 55415
22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25
```

1          **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3              THE COURTROOM DEPUTY:  The United States of

4     America versus Adnan Abdihamid Farah; Court Case No.

5     15-CR-49.  Counsel, please state your appearances for the

6     record.

7              MS. ALLYN:  Good afternoon, Your Honor.  Julie

8     Allyn, Drew Winter, and John Docherty for the United States.

9              THE COURT:  Good afternoon.

10             MR. UDOBIOK:  Good afternoon, Your Honor.  Kenneth

11    Udobiok on behalf of defendant Adnan Farah.

12             THE COURT:  Good afternoon.  Please step forward.

13             Counsel, have you had an opportunity to read and

14    review the presentence investigation report in this matter?

15             MR. UDOBIOK:  Yes, Your Honor.

16             MR. WINTER:  Yes, Your Honor.

17             THE COURT:  Any objections to the factual

18    statements contained in the presentence investigation

19    report?

20             MR. UDOBIOK:  No, Your Honor.  Our objections have

21    been incorporated in the final PSI.

22             MR. WINTER:  No objections from the government.

23             THE COURT:  All right.  The Court will adopt the

24    factual statements contained in the presentence

25    investigation report as its own.

1        Counsel, have you had an opportunity to review the

2    advisory guidelines calculations that have been calculated

3    for the Court by the probation office?

4        MR. UDOBIOK:  Yes, Your Honor, we have reviewed

5    and there's no inconsistency.

6        MR. WINTER:  The government has also reviewed it

7    and has no additional comment.

8        THE COURT:  Okay.  Therefore, the total offense

9    level is 37; criminal history category of 6; custody,

10   180 months; supervised release, one year to life; fine,

11   $20,000 to $200,000; and a special assessment of $100.

12       Counsel, do you wish to be heard for on

13   sentencing?

14       MR. UDOBIOK:  Yes, Your Honor.

15       THE COURT:  You may.

16       MR. UDOBIOK:  Your Honor, first of all, I

17   personally would like to take this moment to thank the Court

18   for one particular reason beyond any other reasons that I've

19   experienced.  I've appeared before this Court many times on

20   other matters, both civil and criminal, but this has been

21   unusual, and unusual in one sense, that the Court has given

22   me and my client so much access to the Court beyond what I

23   am accustomed to, and I thank the Court for that.  Under

24   normal circumstances I would be so terrified to handle this

25   case because of the enormity of the case, the number of

1    exhibits or evidence from the government and the severity of

2    the case, but for -- I don't know how you do it, but you

3    have allowed us to present and advocate to our

4    clients -- for our clients in such fundamental ways, and I

5    would like to thank the Court for that.

6            My client also shared that sentiment, and I hope

7    down the line the Court would give him an opportunity to

8    address the Court.

9            THE COURT:  I will.

10           MR. UDOBIOK:  One singular most important thing in

11   this case is age.  Age has -- I'm not going to regurgitate

12   our brief.  That has been briefed extensively.  But I wanted

13   the Court to see my client and if we can step back

14   retrospectively and imagine how this event transpired for

15   Adnan Farah.  It all started from a place that none of us

16   here could have anticipated, a child who is placed in this

17   school in -- in a school called Heritage Academy, it's a

18   charter school, it's all very meaning important for Adnan

19   Farah and his family for a child to be sent to a school that

20   would teach the students with some focus about the culture

21   and Islam.  But something, something else happened.  While

22   in that school, they became a target.  If one were to

23   recruit young men, the easiest place that you could do that

24   is at a concentration of where it is easy to find these

25   children.  And so Adnan, at the time, where science has told

1   this Court that between the ages of 13 and 16, that's when

2   adolescence have heightened religiosity, they want to be

3   pious, they want to do something greater than themselves,

4   that's the natural scientific or biological evolution of

5   anybody.  But at this time is when Adnan began to consume

6   radical videos.  Did he know that he was becoming

7   radicalized?  Probably not.

8           So by 16 now, Your Honor, he's graduated from

9   Heritage Academy, filled with this sense of idealism,

10  although it is not the proper one, and, of course, skewed

11  religious belief towards violence.  He hasn't done anything

12  yet.

13          His co-defendants are known to him because they're

14  friends.  They're contemporaries.  He's the youngest of all.

15  His older brother is part of this group.  And he goes to

16  South High in Minneapolis.  That's where you would think

17  that he would have left what he has learned from Heritage

18  Academy or the intensity of his religious belief, but at

19  South High, the identity crisis comes about, and this is

20  where I would like the Court to really take note.  I'm sure

21  you have already.

22          So in the general school, in high school now,

23  because he had been raised with a focus on the Somalia,

24  African tradition and religion, he's an outcast in a way in

25  the general mainstream school, and the identity crisis

1    started from there.  So ISIL comes about when he's not

2    quite Somali, he's born here, he's an American citizen, born

3    here, but his parents are Somalians, and they came to this

4    country as adults, they don't have -- they're not as

5    culturized as those who have been born here.  So he's not

6    Somalian.  And there's questions about Islam himself.  But

7    in South High, he's not really a Minnesotan, the way he

8    dresses, the way he talks, and his feelings.  And when ISIL

9    came and with their propaganda and said now you can have an

10   identity, however way they painted that picture, he bought

11   into it.  I believe he told you some of that during his

12   change of plea.  He still is under age at this time.

13          And a couple of dates are -- a few dates are

14   significant.  Because in my motion papers I did tell the

15   Court that when Adnan committed this offense, he was not an

16   adult.  He was not 18 years old.  The PSI is -- it's clearly

17   stated.  Adnan was born in 1996, April 11th, 1996.  But by

18   March 2014, and specifically in 2013, we're getting to the

19   crescendo of this conspiracy, he's still not 18 years old.

20   As a matter of fact, when he went to testify -- when his

21   brother went testify in December of 2013 before the grand

22   jury, Adnan was 17 years old.  And when he accompanied Yusuf

23   on April 24th to purchase to -- to apply for a passport, he

24   had just -- he had just turned 18 by a matter of weeks.  So

25   when I made the statement that his criminal activity as it

1    relates to this conspiracy, a significant portion of it, he

2    committed this offenses when he was a juvenile, I don't

3    know, I -- I'm not trying to --

4              THE COURT:  Mohamed signed --

5              MR. UDOBIOK:  Excuse me?

6              THE COURT:  -- for his passport?  Am I getting

7    people confused here?  I thought Mohamed -- Mohamed, your

8    brother went with you?

9              MR. UDOBIOK:  Yes.

10             THE COURT:  And you weren't -- you weren't 18 at

11   the time?

12             THE DEFENDANT:  I think I had just made 18 then,

13   Your Honor, but they needed I guess reassurance or

14   something.  I didn't have an ID.

15             THE COURT:  Oh, okay.  But your brother was there.

16             THE DEFENDANT:  To sign.

17             MR. UDOBIOK:  Yes.

18             THE COURT:  Okay.

19             MR. UDOBIOK:  So some of this activity, the

20   consumption of the video, Your Honor, one doesn't just all

21   of a sudden in one day is radicalized.  This is a gradual

22   process.  And if you look at the discovery from the Court

23   is -- the indictment even describes some of their

24   conversations, their Tweets and within one another.  A lot

25   of it occurred when he was 17, 16, 17, and 18.  I am not

1    saying, Your Honor, that Adnan should have been part of a

2    juvenile certification process.  That's not what I'm saying.

3    There were events that occurred when he was of the age of

4    maturity.  But what I want the Court to know that he was a

5    child when these events began and there were a lot of

6    influences that affected his cognitive ability and the

7    ability to rationalize what is wrong and what is right.  He

8    knows what he was doing was wrong, no question about it.

9    But the -- what I'm trying to get the Court to see is he's

10   not a typical 22, 23, 24-year-old who is -- who wants to

11   become a child soldier.  There was some influences, some of

12   which was within his control, but some are so powerful that

13   he succumbed to it.

14          The next thing, Your Honor, that I would like

15   to -- for the Court to know to allow the Court to fashion

16   the appropriate sentence was Adnan's desire to go to Syria,

17   was it based on a need for, was it bravado, for violence, to

18   kill people or was there some -- some religious piety?  It

19   was a mixture of both.  It started before he was 16.  And by

20   the time he got to 18 and the co-defendants formulated this

21   singular attempt, it was easy for him to be a part of it.

22   The video became a vehicle.  His identity crisis became a

23   vehicle.

24          He pled guilty, he pled guilty to the conspiracy,

25   and the Court is familiar about, for lack of -- I don't want

1     to minimize it, but the dramatic nature of the change of

2     plea hearing.  Your Honor, I don't want to be personal about

3     this.  I have a 18-year-old.  I cannot imagine if my son is

4     charged with an offense and there are people that are

5     important in his life that he cares about that would tell

6     him disregard your lawyer and do things this way, how

7     difficult that is.

8          I am his second lawyer in this case.  And my

9     coming into this case was based on in part that I'm African,

10    in part I've appeared before you before, and also I'm a

11    person of faith, that I could somehow clarify things to

12    Adnan and maybe the parents will trust me.  I don't know the

13    extent of my successes but the Court knows better.  But I

14    can't imagine that pressure.  And Adnan decided to put those

15    pressures aside and plead guilty and provided this Court

16    with a truthful, candid explanation of his metamorphosis

17    from a young kid playing basketball to wanting to travel to

18    Syria.

19         THE COURT:  Well, don't minimize that.  That's

20    the -- one of the key factors I am -- I'm looking at, and

21    this whole -- the backstory of people trying to ruin

22    people's lives for, I don't know, I still haven't figured

23    out what the reason or cause would be, and then also talk to

24    me about his parents because my understanding is his parents

25    wanted him to go to trial, and then also the affect of his

1    older brother on him.  There's no doubt in my mind for him

2    to make the break, that's a huge break, and so I'll talk

3    about that later, but I want -- don't minimize it right now.

4    I need you to talk to me about it and tell me because

5    you -- you've stated why you were brought in on this case

6    and so you would have more of an understanding and so I need

7    you to help me on it.

8         MR. UDOBIOK:  Your Honor, I will try.  And

9    incidentally, I contemplated disclosing something to you

10   that I haven't disclosed to many people about the experience

11   of being radicalized.  I was -- I was nine years old,

12   between seven and nine years old during the Nigerian Biafran

13   War.

14        THE COURT:  Okay.

15        MR. UDOBIOK:  I was saved by the fact that my

16   grandfather was a customary court judge.  Six of my

17   colleagues were recruited as child soldiers.  And what was

18   it, what did they use?  It wasn't money.  It was cigarettes.

19   And a little tiny badge that you can put a band on the left

20   hand.  That's what it took for these little kids to go into

21   the bushes and see where the government soldiers were.

22        THE COURT:  Evil?

23        MR. UDOBIOK:  Yeah.  So the fact, they knew what

24   they were doing, but because my grandfather was a judge,

25   they didn't -- they didn't come.  So I understand how easy

1    it is to mislead children.  What is the motivator?  I

2    believe the motivator is dislike for the establishment, for

3    whatever that defines.  They think the government does not

4    hear them, the general society doesn't hear them; these are

5    the adults now.

6         And if you look at the entire -- these -- the

7    entire defendants, you're not going to see any of the adults

8    who are behind when they see these children want to do these

9    things call law enforcement.  Usually it's on the tail end,

10   it is law enforcement that approaches the parents and says

11   or these adults.  My client has only talked a little bit

12   about that.

13        And for his own -- in his own case, so he goes to

14   the mosques, and the mosques are segregated, and the adults

15   are not going to tell the truth because they have brought

16   their own conflict from Somalia here to Minnesota.  That's

17   where a child, in church, will receive or in a mosque will

18   receive the truth, however harsh it may be.  But they're not

19   getting it there.  So he goes to school, a general high

20   school, the teachers, whom more than likely are Christians,

21   already are discredited, they don't understand the religion.

22   So who are they left to?  Those colleagues who have already

23   been influenced by the adults.  That's how we get here.

24        And the -- and with Adnan Farah's case is

25   particularly difficult, as the Court has articulated, with

1    an older brother who is a co-defendant, how do you break and

2    testify against your brother?  At the end of the day,

3    whatever amount of years this Court will give Adnan Farah,

4    he has only that same family.  He cannot excise himself from

5    his family.  He can try to re-educate them about how he has

6    traveled to this point, but for 18 and 19-year-old, it is

7    particularly difficult.

8              Another thing about --

9              THE COURT:  Well, isn't it almost impossible?

10   What I've seen on, you know, the -- at least the father on

11   TV, it seems like he's adamant that his children did nothing

12   wrong.

13             MR. UDOBIOK:  What Abdifarrah has said, that they

14   were just kids misled, not by him.  I don't think he misled

15   them.  I understand what Abdi Farah is going through and I

16   also understand what Ayan Farah is going through.  Judge, if

17   the government were to indict me today for whatever offense,

18   I don't care what the government, how compelling the

19   government is, my mom would never believe the government.

20   Her son could do no wrong.  Yes.  That is what is going

21   on -- that is what Ayan is going through and Abdi.  Then

22   couch that with the --

23             THE COURT:  But what's the split between the

24   brothers?  Because it seems like Adnan is the favorite.

25             MR. UDOBIOK:  He's the youngest.

1          THE COURT:  He's the youngest.

2          MR. UDOBIOK:  And I -- I go through that too.

3     My -- my youngest can get everything from me but the older

4     can't, the older one can't.  It's unfair, but that's life.

5          But in this case, though, because Adnan did not

6     buy a ticket, he did not travel, he did not --

7          THE COURT:  Well, that isn't -- that -- the reason

8     why is because his passport was intercepted by his parents.

9          MR. UDOBIOK:  Yes.

10          THE COURT:  Just think if the passport, if he had

11     got the passport, he would be gone.

12          MR. UDOBIOK:  True.

13          THE COURT:  He would have been gone.

14          MR. UDOBIOK:  True.  Yes.  He says that too

15     true -- he says that also.  And that -- Judge, you're just

16     making my point because many, many things have gone on in

17     this case that, with my meeting with Adnan, I have learned

18     so much.  He says publically, and who does that, he says, I

19     thank the government because if they didn't -- if they

20     hadn't indicted me, I would have gone to Syria and I'd be

21     dead.  I think Warsame, defendant Warsame, the main friend

22     that he thought betrayed -- that, you know, cooperated with

23     the government, he thanks them.  Who does that?  Except one

24     that have had the benefit of reflecting the consequences of

25     his behavior and what would have happened to him if he had

1    gone on.  Is he rehabilitated?  Maybe not completely.  Is he

2    dangerous?  Absolutely not.  He's not dangerous.  Would he

3    want to go to Syria or any other group now?  No, he

4    wouldn't.

5             I will let you ask -- I will let him talk for

6    himself because he will paint while is he not going to

7    change his faith as a Muslim, but he will describe what

8    Islam is to him, and that's the Islam that I'm familiar

9    with.

10            There's a statement Adnan made to me that I think

11   the Court should know.  He says this, that the way to stop

12   young children going to Syria or any -- particularly

13   al-Shabaab or ISIL is not necessarily by prosecution.

14   Prosecution is a deterrent, he admits.  But we have to get

15   at young people with ideas.  He did not get radicalized by

16   carrying a weapon.  He did not get radicalized by sitting at

17   the mosque and listening to radical clerics preaching.  He

18   became radicalized by watching videos, otherwise

19   self-radicalized, coupled with the boundaries in society

20   that exists for every single one of us but because of the

21   nature of their migration, the parents' migration and his

22   colleagues, those buffers aren't there.  And so we need to

23   compete through ideas.  And I think that tells us whether --

24   or this Court whether he's remorseful, has he changed.

25            Daniel Koehler's report, this Court's expert, said

1    that he's at a turning point, and I agree.  What made him

2    get to the turning point?  It was after listening to

3    credible adults in his life, listening to me, listening to

4    this Court, and a cold cell room for one to reflect for all

5    these -- for over a year, and he's read a lot, and he

6    realized that what he has been sold was a big lie.  Adnan

7    said something a few months ago, he said, these ISIL

8    leaders, they never send their own kids to go die; they'll

9    send some other person's kid.  And that's poignant.  I just

10   addressed the Daniel Koehler's report, and the Court is

11   familiar with that.

12           Now, there's one other question I want

13   to -- that's probably in the Court's mind based on what our

14   last hearing that the Court asked this question or made this

15   statement that you have this obligation to protect, to

16   public safety is important to this Court.  Your Honor, it's

17   important to every single one of us, and including me, and

18   we've had a meeting in camera.  I had questions myself even

19   taking this case.  What is going to happen to me because I

20   have spoken so publically against ISIL?  What is going to

21   happen to my client because he has spoken so vociferously,

22   he has spoken to local press, there's a five-part series on

23   it, he talks, what is going to happen to him?  Is there any

24   sense that we should conceal things or hide things out of

25   self-interest?

1          I think based on Adnan's openness, I believe that

2     he's not a public threat.  Everyone now knows him as a

3     terrorist.  He pled guilty as a terrorist.  Channel 5 did a

4     story and the captions was "From Teenager to a Terrorist."

5     That's who he is now.  And he admits it publically, and I'm

6     sure he'll admit it here today.

7          Is he going to take any steps consistent with what

8     he pled guilty to endanger people?  I think not.  Can he be

9     an element of truth telling?  I think so.  What would he

10    benefit from?  Some counseling to make sure for this Court

11    that it is clear, and I believe Dan Koehler also agreed with

12    that proposition.

13         There is something that with Adnan Farah it's not

14    described extensively and that is his conversations, private

15    I'll call it locker room, in my brief I call it puffing, I

16    call it talking, and with recent election phrase, locker

17    room talk.  Albeit, it's important in this case.  There were

18    many discussions that Adnan had with his co-defendant.  Was

19    he expecting anyone else to see it?  No.  Did he have those

20    conversations in the midst of being radicalized?  Yes.  Do

21    we always mean our private conversation, do we take -- do we

22    all take steps consistent with our private conversation?

23    No.  This election could tell us that we don't always do

24    that.  But it is there that he professes Jannah, he

25    professes martyrdom, but it was all talk.

1          The reason, Your Honor, that I say it was all talk

2     is his ability to go to Syria was impractical.  First of

3     all, his passport was taken from his parents.  He sought to

4     buy a fake passport to travel from an informant.  That was

5     impossible.  And you can't drive from --

6          THE COURT:  Oh, yes, it was, he's -- he was on his

7     way to San Diego to get that passport but everyone started

8     thinking about how would we get caught and we would get

9     caught if Adnan came with us because he's mama's boy and

10    mama would be looking for him an hour after he was supposed

11    to be home for dinner.

12         MR. UDOBIOK:  Yes, Your Honor.  That's true.

13         THE COURT:  And so they knew that he was a

14    liability.

15         MR. UDOBIOK:  Yes, Your Honor.

16         THE COURT:  That's why he stayed home.

17         MR. UDOBIOK:  Yes.

18         THE COURT:  Not because it was not a possibility.

19         MR. UDOBIOK:  No, no, I'm -- Your Honor, what I'm

20    saying, it was -- looking at that fact, if I'm -- if -- I

21    use this classic, if I'm going to go rob a bank, I don't

22    take my younger brother who's ill, I want someone who can go

23    faster.

24         THE COURT:  He was in the planning, he was ready

25    to go and I suspect his bags were packed, and he was ready

1    to go with his brother and the other folks, but they said

2    no, and he agreed, because he would jeopardize the whole

3    operation.

4            MR. UDOBIOK:  Your Honor, I believe what

5    actually -- what transpired there was you don't have your

6    passport, people are going to come looking for you, you

7    don't have money, you are a mama's boy, you are not ready,

8    wait for the next try.  Those are all circuit breakers, Your

9    Honor --

10           THE COURT:  Sure.

11           MR. UDOBIOK:  -- to the success --

12           THE COURT:  I'll take that.  But still, the end

13   result, he didn't go.

14           MR. UDOBIOK:  Yes, Your Honor.

15           THE COURT:  And he didn't go not because he didn't

16   want to go.  The checkmarks were there in the boxes saying

17   that he didn't have the proper credentials and he would

18   cause alarm to his mother and his mother would be looking

19   for him and causing great difficulties.

20           MR. UDOBIOK:  Yes, Your Honor.  We concede that.

21   I mean, we -- he was part of the conspiracy.  He would have,

22   you know, that's why he thanked the government

23   for -- thanked the informant for saving his life.  He -- he

24   would have gone.  So thank god that the opportunity did not

25   quite ripen for him to be able to go.

1          The question left for this Court now is what is

2     the appropriate sentence?  I tried from looking -- looking

3     around the country, as you had required us to do, and

4     sentences around the country for one within the age of 17

5     and 19 in ISIL or even al-Shabaab conspiracy and one with

6     not the level of the culpability of the other codefendants

7     and including those who went to trial.

8          While I'm not going to mirror the -- the Colorado

9     case that I cited, but I think it -- it's -- it could be

10    applicable.  While the Colorado case the defendant was I

11    believe mentally ill and also young and made some

12    significant attempts also, it's similar to what Adnan did.

13    Now, he did not cooperate as the Colorado case.  But the

14    Court, as we explained later, as we explained the

15    circumstances that prevent him to have testified.  For one

16    this young, the enormity of testifying, including an event

17    that includes your brother, that was the deterrent, coupled

18    with my explanation in my sealed brief.

19         THE COURT:  Well, I -- in, what, 45-plus years, I

20    haven't -- I can't remember, we haven't had a case where a

21    brother has testified against another brother?  No, we've

22    never had that.

23         MR. UDOBIOK:  I think also the government can

24    explain this, I think it's part of the U.S. attorney policy

25    not to -- it's a policy not to encourage immediate family

1       members to have to testify against one another.  And

2       I -- I -- don't quote me, Your Honor, but I think it's --

3                THE COURT:  But I'm just saying that in my

4       experience, I haven't seen it.

5                MR. UDOBIOK:  With that, Your Honor, I think --

6                THE COURT:  So I wouldn't expect him to do that.

7                MR. UDOBIOK:  Thank you, Your Honor.

8                THE COURT:  Whereas other of the co-defendants I

9       would.

10               MR. UDOBIOK:  Yes.

11               THE COURT:  But that's the -- dealing with the

12      sentence, I'm -- I'm always two or three steps ahead of you.

13      The family situation, his brother situation, when you say

14      he's not liable to re-offend because he's been labeled a

15      terrorist, and he is a terrorist, well, where else is he

16      going to go?  He's going to go back, that's what happens,

17      they fall back into the religion because the religion says,

18      see, you've been rejected, come, come back with us.

19               MR. UDOBIOK:  Your Honor, I agree, but this

20      is -- this break, this break is a gulf.

21               THE COURT:  But you've said it, where is he going

22      to go?  He's going back to family.  He's not going to disown

23      his mother.

24               MR. UDOBIOK:  No, he's not going to disown his

25      mother.  But the Court and the government has done it, you

1    know, in a way that he has not betrayed the trust of his

2    brother.  The family is still intact.  The mother still

3    loves him.  The dad still loves him.  Now, would the mother

4    or the dad encourage him to take this path?  That would be

5    insane, no, the loss of two sons to significant -- to the

6    justice system.  I have -- I have had the benefit to visit

7    with this family more than in any case I've ever handled,

8    and I see the way the other two boys, the two boys, I wish

9    they're here in court, I don't know where they are, how they

10   look up to him and how he directs them, even in jail, as

11   a --

12            THE COURT:  Who, Mohamed or Adnan?

13            MR. UDOBIOK:  Adnan.  They look up to Adnan.

14            THE COURT:  Okay.

15            MR. UDOBIOK:  They're teachers and how he talks to

16   them on Saturday when they go to Anoka County, they can't

17   wait to talk to him, and the conversations have always been

18   school, stay out of trouble.  The younger ones say you got

19   here.  He tells them I got here because I was stupid.  I was

20   stupid, listening to people I should have known don't have

21   my interests at heart.  And I -- that is what I hope that

22   the Court will take into consideration.  A long time

23   incarceration will not take into consideration his change of

24   heart and his public denial of ISIL, their likes, and even

25   the ideology.  He has a new ideology.  And he will explain

1    it to the Court.  Thank you.

2              THE COURT:  All right.  Adnan, this is your

3    opportunity to speak to me.

4              THE DEFENDANT:  Your Honor, I would like to start

5    off by saying to you and also to the world that I'm guilty

6    of the crimes that I -- I mean, I've pled guilty, and I am

7    guilty of the crimes that I have committed, and I'm trying

8    to take responsibility for the actions that I have committed

9    against this country, against my community, against my

10   family.  And I understand I did wrong, Your Honor.  I'm not

11   denying that whatsoever.

12             I want to apologize to my family, my mom, my dad.

13   They're the most selfless people I know who would give

14   anything for me, for the trouble I've caused them, and I

15   don't know how -- I don't know how to say sorry to them, but

16   I'm deeply sorry for what I've caused them.

17             Your Honor, as I talked about in my plea, when I

18   took my plea deal, about how this crime came about, Your

19   Honor, it came about because I was misled because I was

20   looking at this propaganda with an open heart.  When

21   I -- when I talk about identity crisis or I was lost for who

22   I was, I was seeking to become somebody, to be a part of

23   something.

24             I went home to conservative Somali parents who

25   loved me dearly, but they would misunderstand me.  I went to

1    school, mainstream school, then I went to Saturday, Sunday

2    religion school where you can't hear nothing about rap or a

3    movie or anything, it's strictly about the religion.  So I

4    was lost with who I was.  And I started looking into the

5    ISIL propaganda.  And when I say that it's an ideology, it's

6    an ideology, Your Honor, because I didn't become radicalized

7    in one day.  I took steps.  As I spoke about it in the

8    court -- in public, this ideology, it's a great disease,

9    Your Honor, because they use the religion.  And to make an

10   example, on one of their videos, Your Honor, they show them

11   digging trenches and they say the very same trenches the

12   Prophet built.  They prophesied it.

13            THE COURT:  Well, the trenches are being dug by

14   Shiahs where they're going to be killed and

15   they're -- they're digging their own graves.  That's the one

16   I saw.

17            THE DEFENDANT:  No, I'm not talking about that

18   trench, Your Honor.  I'm talking about a video that I

19   watched, they were building the trenches to go underground.

20            THE COURT:  Oh, okay.

21            THE DEFENDANT:  And --

22            THE COURT:  Tunnels.

23            THE DEFENDANT:  Tunnels.

24            THE COURT:  Tunnels.  All right.

25            THE DEFENDANT:  Tunnels.

1          THE COURT:  Yeah, I saw that one too.

2          THE DEFENDANT:  And they say it's the same -- it's

3     the same tunnels that the Prophet and his companions were

4     building.

5          THE COURT:  Right.

6          THE DEFENDANT:  So it is simple to say that I fell

7     for that propaganda, Your Honor.  I gave into the videos.

8     Like I've told the Court, I watched numerous videos.  I read

9     books about Jihadology.  But, Your Honor, one thing I didn't

10     find was someone to come up to me and say hey, you heard

11     about this propaganda that's going on that's wrong in the

12     community.  Everybody was scared to talk about it.  When we

13     were sitting in the mosques, Your Honor, watching those

14     videos, best believe those same scholars are in the mosques

15     talking, drinking coffee and this is happening in their

16     mosque.  So what I'm getting at is, Your Honor, nothing or

17     nobody tried to stop us from this ideology from an

18     educational standpoint.  You got to combat an ideology with

19     an ideology.  I've looked at numerous, numerous statements

20     on Facebook and Twitter, as you know, we were looking at

21     stuff they were saying -- people combating it and people

22     saying this is right or this is wrong.  I was looking into

23     it, Your Honor.  But I fell victim, Your Honor.

24          I want to touch upon my co-defendants.  Your

25     Honor, my co-defendants were all friends and brothers, from

1    the one who set us up from the one who testified from the

2    one who went to jury.  At one point we were all radicalized.

3    And that's what people are seeming to forget.  And that's

4    what people are seeming to point fingers and stuff, but what

5    I'm saying is --

6            THE COURT:  Well, I'm not -- I'm not -- I've been

7    saying that from yesterday to tomorrow, every single one of

8    you were radicalized and some of you still are for different

9    degrees, and so I know that.  The community may not.  And

10   I've been saying it out loud that it should be printed,

11   shown on a TV, this was a Jihadi cell.  Everyone talks about

12   Brussels or Paris having cells, we have a cell here in

13   Minneapolis.

14           THE DEFENDANT:  I would like to thank the federal

15   agents who stopped me, who arrested me, because if it wasn't

16   for them, maybe I wouldn't be here today.

17           Your Honor, I don't know how to say this, but I

18   just want you to know that I'm deeply sorry, Your Honor.

19   Some might say I went to the media for sympathy, but the

20   reason why I chose to go to the media is because, Your

21   Honor, I want everyone in the community and in the country

22   to know of how this ideology process goes about.  I want

23   people to understand that this identity crisis is something

24   real that's happening.  And I guarantee there's kids going

25   through that right now.

1            THE COURT:  There's no doubt about it because

2      there used to be a group of ten to -- between six and ten

3      that used to come to all the hearings and sit back in the

4      back corner and some of the defendants would give them

5      signals and so that was egging them on, and I know they're

6      there.  I know they're out there.  I know they're out there.

7      The community knows they're out there.

8            THE DEFENDANT:  And last but not least, Your

9      Honor, I'd like to ask for your mercy today.  Maybe I'm not

10     deserving of it, but, Your Honor, I think everybody deserves

11     a chance.

12            Your Honor, what I came to realize in that cell

13     for the last year and a half is that I was blindly

14     following.  When you sit down and you contemplate and you

15     learn for yourself without any persuasion or being led, I

16     came to realize that, Your Honor, ISIL doesn't have the real

17     Islam.  They tell you to kill your neighbors.  And the

18     Prophet talks about in the hadith that I've seen to treat

19     your neighbors the way you would want to be treated.  So

20     they manipulate the religion, Your Honor.  And I read about

21     how many people became Muslim under the prophet of

22     generosity and that true Islam is giving not taking.

23     Killing one life is like killing all of humanity.  So I

24     apologize, Your Honor, once again.  And I hope you can see

25     that I'm not faking anything here.

1          THE COURT:  Sidebar.

2      (Discussion held at the bench on the record.)

3          THE COURT:  Well, I can't ask him any questions

4    right now because I haven't sentenced his brother.  I need

5    to sentence his brother first and have some distance between

6    so he knows what I am going to do to his brother and then

7    he'll have time to reflect upon that and then I'm going to

8    ask very pointed questions.  I have to have these answers.

9    Because he's going to go to prison.  It's just about how

10   much time.  And so I need, for his sake, and the reason why

11   I say this, because he wanted to plead guilty and I saw that

12   and I hope you saw that or if not, tell me that it was all

13   fake, but I -- he wanted to -- the break from his family,

14   with everything going on in his family and the sheikh to be

15   involved in everything, that's amazing.

16          MR. UDOBIOK:  It's the sheikh.

17          THE COURT:  Yeah.  Yeah.

18          MR. UDOBIOK:  It's the sheikh.  The sheikh gave

19   advice to the family.

20          THE COURT:  Right.

21          MR. UDOBIOK:  They're not sophisticated lawyers.

22          THE COURT:  I understand that.  And so it -- and

23   he may still be giving them advice.  He's a spiritual

24   advisor.  So you roll all that in.

25          MR. UDOBIOK:  He's out of the question now.

1    He's -- he's out of the question.

2              THE COURT:  Is he?

3              MR. UDOBIOK:  Oh, yes.  As far as Adnan is

4    concerned because --

5              THE COURT:  Well, let me talk about the family.

6    If he's still involved in the family.

7              MR. UDOBIOK:  He's not.

8              THE COURT:  Well, hear me out.

9              MR. UDOBIOK:  Okay.

10             THE COURT:  What I would like to do is continue

11   this to January or February so it gives him time to

12   contemplate, because his brother is looking at substantial

13   time and so once that is severed, I want to see how he's

14   going to react to that and how the family is going to react

15   to that, because if you're talking about any type of

16   reduction in sentence from 15 years, I have to see

17   what -- how that's going to play on him, because it could

18   just push him right back into extremism, very easy.  He's

19   close, you know, he's just a -- he's a step out, he's got

20   one foot out.

21             And the problem is he doesn't have a safe harbor.

22   He's got a brother.  He's got a family.  And that's where

23   the recidivism, of all of the people that I see right now,

24   he would be the one to recidivate because it would be so

25   easy to explode because either his family is going to reject

1    him from what he's done, and if his family rejects him, then

2    his only family is ISIL.

3              MR. UDOBIOK:  True.

4              THE COURT:  So that's my thoughts.  Anybody want

5    to jump in?

6              MR. WINTER:  Well, Your Honor, obviously you get

7    to tell us when to show up for a sentencing hearing, and

8    we'll show up whenever you tell us to show up for a

9    sentencing hearing.

10             THE COURT:  Do you want to go ahead with your

11   presentation and so we'll have that on the record and so he

12   has to think about that and that gives me the government's

13   position?

14             MR. WINTER:  I actually would prefer that

15   opportunity, Your Honor.

16             THE COURT:  Okay.

17             MR. WINTER:  I appreciate that.

18             THE COURT:  All right.

19             MR. WINTER:  Because I -- I understand what the

20   Court has in mind.  I -- I don't know what else factually

21   would develop regarding the Sheikh Jama situation.  I think

22   it kind of, to use a very tired expression, it is what it is

23   and we kind of generally agree to what it is, but I

24   understand where you're coming from.  But I would appreciate

25   that opportunity today.

1           THE COURT:  Okay.  Let's do it.

2           MR. WINTER:  All right.

3       (End of bench conference.)

4           THE COURT:  I'm going to hear from the government

5   at -- is there anything else that you wish to tell me?

6           THE DEFENDANT:  No, Your Honor.

7           THE COURT:  All right.  I'm not going to ask any

8   questions at this time.  I'm going to hear from the

9   government.  Why don't you please have a seat.

10          MR. WINTER:  Thank you, Your Honor.  I need to say

11  out of the shoot here that I am actually quite stunned with

12  what this defendant has just told the Court.  I am stunned

13  because he is pointing fingers everywhere in this case.  If

14  you heard, and I know you did, one of the things that he

15  brought up was let's not forget about the other people in

16  this case.  Let's not forget about the others.  Let's not

17  forget to point our fingers elsewhere, other than at what I

18  have done.  He actually used the term "set us up" in

19  reference to the individual cooperators.  If that isn't a

20  statement of blame shifting and failure to accept

21  responsibility, I do not know what else is.  I could stop by

22  presentation right now and ask the Court for a 15-year

23  sentence and based on his opinion that he got setup, I think

24  the record would be very justifiable for a 15-year sentence.

25          Talking about what was missing was somebody

1    telling him that it was wrong.  That's a stunning, stunning

2    statement to make at this point, standing here at this

3    podium to you.  He's blaming people around him for simply

4    not telling him that joining a organization that routinely

5    beheads people is wrong.  It's quite stunning, Your Honor.

6         I also need to address some of the liberties with

7    the facts that are taken in this case.  He was 18 when he

8    applied for his passport.  He was 18 when he lied for a good

9    half-hour in front of the grand jury in June of 2014.  He

10   was 18 when he lied for a good half-hour in front of the

11   grand jury again in January of 2015.  He was 18 when he

12   attended multiple meetings.  He was 18 when he watched the

13   beheading videos and the genocide videos, let's call them

14   what they are.  And he was 19 when he was ready to hop in

15   that car and, as the Court points out, just didn't get in

16   due to factors beyond his control.  Those facts I thought

17   were glossed over and needed to be corrected.

18        It was also stated that he took no actions that

19   were consistent with his statements.  He took a myriad of

20   actions that were consistent with his statements.  I don't

21   want to catalog them all, and I don't think we have the time

22   for that, but I think the Court is aware of the record in

23   this case.  And we can just talk about fake passports, we

24   can talk about attending meetings, all of those things are

25   consistent with what he was talking about doing.  He just

1     didn't get the opportunity to go because there were -- there

2     was no passport and when that was taken away from him, he

3     went to plan B which is to get a fake passport.  Again, to

4     somehow take credit for the fact that some other forces

5     stopped him I think is absurd and is slightly offensive,

6     Your Honor.

7             You look at some of his statements that he made

8     along the way.  And, again, with -- not today because he's

9     smart enough not to do it, to talk about these videos and

10    how he felt like he was going to render humanitarian aid and

11    it was the children and his opening of his heart, it is a

12    fact that in the 40-plus hours of taped conversation with

13    this defendant and the others, there is one occasion where

14    they talk about children, and the one occasion where they

15    talk about children is they were admiring the fact that ISIL

16    is using these Kazakhstan kids and training them to be

17    soldiers.  Now, it wasn't this defendant, just so the record

18    is clear, but that is the one occasion where they talk about

19    children in this case and they're admiring ISIL's use of

20    children.

21            He also wants to talk about being led around.  He

22    wants to give the impression that he's been led around by

23    other people in this case.  I would bring one example to

24    your attention that that is simply not the case.  Guled

25    Omar, as we're aware, spoke frequently about the conspiracy

1    in recordings, and he described how it was that Hamza Ahmed

2    ended up as a part of the JFK-4 as opposed to travelling

3    with Guled Omar, and Guled Omar placed it squarely on the

4    shoulders of this defendant here, that he convinced him that

5    this man here, Adnan Farah, who sits here with his head

6    bowed, he was the one that convinced Hamza Ahmed to go with

7    the JFK-4.  And we don't have to take Guled Omar's word for

8    it because his own brother says it was Adnan.  And so this

9    idea that he's young, that he's impressionable, that he was

10   led around is simply not consistent with the facts and the

11   evidence in this case.

12        And the Court has kindly pointed us to that *Miller*

13   decision, and I think the *Miller* decision really supports

14   the idea that the age, albeit he's a young adult, it doesn't

15   matter in this case.  This case is unique, this set of facts

16   is unique, and this defendant is certainly unique.

17        We can't make dumb decisions.  We got to be smart.

18   He talks about, you know, modes of transportation.  He talks

19   about the fact that he is so tired and concerned about the

20   FBI surveillance that he wants to get a pistol because these

21   guys are getting followed.  Again, statements made when no

22   one else is listening I think weigh a little bit more than

23   the statements made here at a podium while one's sentencing

24   hangs in the balance.  And that is certainly one of them.

25        So the government can't stress enough that what he

1    did today, what he did with Daniel Koehler and to a certain

2    extent what he did at the plea hearing is more of the same

3    game that he has been playing since day one, and the fact

4    that he started getting radicalized before he turned 18 has

5    nothing to do with why we're here today and should have

6    nothing to do with your sentence.

7         And I'm going to echo comments I made earlier.

8    This is a crime of betrayal.  He betrayed his country,

9    betrayed his community, he betrayed his family.  It's a

10   crime of choice, conscious, intelligent, not smart but

11   there's intelligence there, choice.  He chose his

12   co-conspirators, he chose his mission, and he chose the

13   organization that he was going to fight and kill for.  And

14   he did all of this knowing that his family knew -- or were

15   concerned about him.  They were aware, they were concerned,

16   otherwise why would they have secured his passport?  He did

17   this knowing that Hanad Mohallim was already dead in Syria,

18   and he did it knowing that the FBI was watching his and his

19   co-conspirators' moves.

20        These tears, this talk of caring personalities and

21   open hearts, I don't see the connection between that and

22   them sitting in a room watching those videos and placing

23   themselves, which they clearly didn't do, but placing

24   themselves in the mindset of one of those men.  They're

25   prodded like cattle.  And he talks about being young.  If

1    you look at those faces in those videos, I venture to guess

2    that 80 percent of them are the same age as this defendant

3    and the defendants in this case, if not younger, and

4    certainly from far more trying circumstances.  And they got

5    to watch the guy in front of them have a bullet put in his

6    head and the guy in front of him and the guy in front of

7    him.  So to sit here and talk about how he's the victim, he

8    called himself a victim, he said that word on the record, I

9    find amazing and certainly meriting a 15-year sentence.

10   Thank you.

11          THE COURT:  Well, before you, the issue that I

12   talked about at sidebar, no one has given me any, I may have

13   missed it, information about the dynamic between the

14   brothers.  He's got an older brother involved in this.  You

15   know, I've never seen -- I've only seen the evidence that's

16   been presented at trial.  I don't know if there's -- what's

17   going on there.  Is there -- and that's --

18          MR. WINTER:  Your Honor --

19          THE COURT:  -- the issue that I have a question

20   about.

21          MR. WINTER:  In terms of what the evidence shows

22   about the relationship between the brothers, I think it's a

23   fair characterization to say that as the younger brother,

24   his parents were more watchful and more concerned, for

25   whatever reason, with his activities and his == what he was

1    doing.  I don't know why that is.  It could be simply the

2    fact that he's -- was the younger brother of the two.

3    That --

4              THE COURT:  What about the dynamic between

5    brothers?

6              MR. WINTER:  And that side, I was going to say,

7    the dynamic between the brothers, my honest assessment, Your

8    Honor, I've listened to these tapes, I've read every word of

9    the transcripts, there is no big brother/little brother

10   dynamic that I see.  He's not -- Mohamed Farah isn't telling

11   him what to do.  I would venture to say, and this is

12   certainly, you know, I'm used to having to prove things

13   beyond a reasonable doubt and I won't can't suggest I could

14   do that, but I would venture to say that Adnan Farah has

15   just as much influence over his older brother as his older

16   brother has over him or anyone else.  My honest assessment,

17   Your Honor, is it's a very -- it's a balanced situation.

18             THE COURT:  My next question, then, for the

19   government is what is the government's position with him,

20   Adnan, breaking from the family and the other co-defendants

21   and wanting to plead guilty?

22             MR. WINTER:  Our position is that we, and we've

23   said to the Court, we recognized that there was undue

24   influence which delayed his guilty plea, and that's really

25   where it ends.

1          THE COURT:  Well, I guess I'm not expressing

2     myself well.  For him to make the big leap of saying I want

3     to plead, I want to plead guilty and having the pressure of

4     his parents saying no, having four or five defendants saying

5     they're going to go to trial and you've got to stay with us.

6          MR. WINTER:  Mm-hmm.

7          THE COURT:  It seems to me that's a little bit

8     more than just raising your hand and saying I want to plead

9     guilty.

10          MR. WINTER:  No, and I would agree with you, Your

11     Honor, absolutely.  That every defendant that comes before

12     you has certain forces to overcome before they can accept

13     what it is they've done or enter a plea, and he had some

14     unique ones, there's no question about that, and if there

15     were -- if there was a laundry list of other things that had

16     taken place leading up to that and -- and after that that

17     continued to put things in the column of having truly

18     accepted responsibility, having truly recognized what was

19     going on and making true, genuine, sincere efforts to make

20     things better, I might be a little more responsive to that

21     piece, but we certainly don't deny that he overcame pressure

22     and significant pressure.  And he also has a very good,

23     capable, helpful, talented attorney that helped him turn

24     that corner.  So we certainly don't dispute that.

25          THE COURT:  Well, I think I can ask my questions

1    now.  We can continue with the sentencing.  And then --

2    because now I know the government's position, it's been

3    articulated and for the record and now let's get to the

4    nitty-gritty.

5           You see yourself as a victim in this matter?

6           THE DEFENDANT:  Your Honor, I didn't mean that.  I

7    stated that I take responsibility for my actions.  When I

8    say "victim," I'm talking about the ideology process, Your

9    Honor.  I'm not talking about myself.

10          THE COURT:  Well, explain that to me.  I don't

11   understand that.

12          THE DEFENDANT:  I'm saying the ideology process

13   that's taken when you're being radicalized, in that essence,

14   I said I fell victim, Your Honor.  For my actions --

15          THE COURT:  Oh, you fell victim.

16          THE DEFENDANT:  Yeah, correct, Your Honor.  But

17   for my actions I take responsibility.

18          THE COURT:  What's your relationship with your

19   brother?

20          THE DEFENDANT:  My brother is my big brother, Your

21   Honor.  He's a man I love, you know.  Me and him were -- he

22   took me under his wings when we were kids.  He tried to keep

23   me out of trouble because I was the one who was always going

24   off after girls, one who was going off to smoke, going off

25   to do all of these things, that was me, so, it -- he kept me

1     grounded.

2          THE COURT:  Did he pull you into this?

3          THE DEFENDANT:  No, Your Honor.  I made my own

4     decisions.

5          THE COURT:  I'm going to say it one more time, did

6     he pull you into this?

7          THE DEFENDANT:  No, Your Honor.  I made my own

8     decisions.

9          THE COURT:  When your parents took your passport

10    and you must have had a conversation with them.

11         THE DEFENDANT:  I did, Your Honor.

12         THE COURT:  Tell me about it.

13         THE DEFENDANT:  When my parents took my passport,

14    Your Honor, it was -- it was genuinely a surprise to them

15    that I applied for a passport.  And there was a discussion

16    between me and my mom and my dad, us three alone, my mom and

17    dad said, "Are you not happy with the way we're raising you

18    or the way we're loving you?"  At the time, Your Honor,

19    I -- I -- I didn't even know how to answer them.  I didn't

20    know what to say.

21         THE COURT:  Why didn't you tell them that you were

22    thinking about going to Syria?

23         THE DEFENDANT:  I didn't want to bring my parents

24    into this, and I knew it would break my mom's heart to even

25    hear that from me.

1           THE COURT:  But you were going to go.  If you had

2    gotten that passport, you would have gone.

3           THE DEFENDANT:  Correct, Your Honor.

4           THE COURT:  You would have broken her heart.

5           THE DEFENDANT:  Correct.

6           THE COURT:  You would have been dead.

7           THE DEFENDANT:  Correct.

8           THE COURT:  Do you think by being a martyr,

9    quote-unquote a martyr, that your mother would go to heaven?

10   Is that part of it?

11          THE DEFENDANT:  That's what I thought, Your Honor.

12   Because in -- in the process, Your Honor, they say how can

13   you pay your parents back of all the struggle, it says that

14   if you put your mom on your back and you tour the

15   pilgrimage, you wouldn't be able to pay her back, but if you

16   die as a martyr, they say, in essence, that you would open

17   paradise for her.

18          THE COURT:  But that wasn't the driving force for

19   you to go to Syria; the driving force was for you to go

20   kill.

21          THE DEFENDANT:  Correct, Your Honor.  I was

22   watching the videos, like I've stated, of the genocide that

23   was happening over there, the chemical usage against those

24   people, and I was willing to help -- willing to help fight.

25          THE COURT:  Why would you believe Shiah were

1    apostates, not worthy of being alive?

2            THE DEFENDANT:  I don't believe that Shiahs are

3    not -- are apostates but I believed that Bashar al-Assad and

4    his regime, some who are Shi'ites, committed genocide

5    against these people, Your Honor, and wrongfully did --

6            THE COURT:  Well, you know, the Islamic State is

7    adamant about Shiahs not being Muslim and being an apostate,

8    so I -- how would you fit in?

9            THE DEFENDANT:  Your Honor, to the level of my

10   education, it being so little, in Islam, as long as a person

11   believes in God and believes in the Prophet, they're Muslim,

12   but some Shi'ites go to the extent that they don't believe

13   in the Prophet.

14           THE COURT:  Counsel, anything?

15           MR. UDOBIOK:  Other than the fact that, Your

16   Honor, I -- this is just too weighty, I just want to address

17   when my client used "set up," I hope the Court understands

18   that he's not saying that the government informant made him

19   do what he wasn't intending to do.  He used "set up,"

20   meaning wearing a wire and all of that.  That's what my

21   client meant.  By no means is he diminishing his

22   culpability.

23           THE COURT:  All right.  Anything further for the

24   government before sentencing?

25           MR. WINTER:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Anything further for the

2     defense or, Adnan, anything else before you -- before I

3     sentence you today?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  All right.  On April 14th, 2016, the

6     defendant pled guilty to conspiracy to provide material

7     support to a designated foreign terrorist organization in

8     violation of Title 18, United States Code, Section

9     2339B(a)(1).  It is considered and adjudged that the

10    defendant is guilty of that offense.

11         The Court has read the presentence investigation

12    report.  The Court has read all of the submissions that have

13    been given to the Court by all parties, and I've read them.

14    The Court has reviewed all of the pertinent federal cases

15    dealing with terrorism.  The Court has had -- well, we've

16    had extensive sentencing hearing this afternoon, and the

17    Court is ready to sentence.

18         Why don't you have a seat.  I would like to talk

19    to your parents.  Could you have your parents come forward?

20    Swear the interpreter, please.

21      (The interpreter was sworn in.)

22         THE COURT:  Good afternoon.

23         DAD:  (In English) good afternoon.

24         THE COURT:  I wanted to for you -- I have met -- I

25    have met you because of your medical condition the last time

1    -- a couple of times before, and so I want to make sure that

2    you're okay.  Are you all right?

3            DAD:  She's still sick.  She has been suffering

4    from high blood pressure, sleep loss, insomnia, other

5    conditions.

6            THE COURT:  Well, I wanted you to see me closer

7    and understand that I would never want to be in your place

8    of having two sons that are going to go to prison.

9            MOM:  Okay.  I just wanted to let you know, Your

10   Honor, that I have been suffering a lot through this

11   process.  My husband has been having a hard time.  And I

12   wanted to let you know that, you know, my pain and the pain

13   that I've been experiencing.

14           Okay.  Your Honor, as a mom, you know, as a black

15   woman, as a Muslim woman, I was brought here into this

16   country as a refugee, and I am just asking the Court to

17   exercise leniency as far as what the sentence that you're

18   about to render today.  Whatever sentence that you render

19   today, I accept that, I will accept it.  I will be happy

20   with it.  I'm willing to live with it.  I just feel like

21   it's up to God, it's something that I'm willing to accept.

22           I have other children, some of them are here today

23   with us, they're sitting in the gallery, they're here.  I

24   don't want them to -- their hearts are broken today.  I

25   just, you know, don't want them to have this feeling,

1    negative feeling, towards this country.  This is their

2    country.  They were born in this country.  And I just don't

3    want them, their hearts to be broken today.

4         We love this country.  We're grateful for this

5    country.  I came to this country of my own choosing.  I will

6    live here.  I will die here.  I just want to have my rights

7    protected and my children's rights protected, but I just

8    want to make sure that everybody understands that we love

9    this country as much as anyone else.

10        THE COURT:  Sir, is there anything that you wish

11   to say?

12        DAD:  There's a lot of things that I wanted to

13   tell you about today, but if I may, but I don't know if I

14   have enough time today.

15        THE COURT:  Well, give me a preview.

16        DAD:  Okay.  I just wanted to tell you, Your

17   Honor, that I can speak English but I would rather use the

18   interpreter.

19        THE COURT:  That's fine.

20        DAD:  We were brought here to this country as

21   refugees.  I was allowed in this country.  I was given

22   safety sanctuary.  I met my wife, a beautiful, lovely woman.

23   We have children.  We raised those children here in this

24   country.  So my children, they were all born in this

25   country.  I tell them all the time that they are part of the

1    society, that they, this is their country, and they have

2    rights as much as anyone else, they can take advantage of

3    any opportunity that this country offers to a citizen, they

4    don't have to speak Somali.  I just encouraged them that

5    this is their country, they do not have any other country.

6          Okay.  So with regards to the case that we're here

7    for today, my children were misled.  They were misled by

8    others.  They were led around by others.

9          One regret that I have is that the state or the

10   government did not come to us beforehand and tell us that

11   your children are involved in this serious situation.  They

12   did not tell that beforehand so we knew about that.

13         Okay.  I just wanted also to say that, you know,

14   whatever happened, happened, no one can change that, that's

15   in the past.  I have another child who is involved in this

16   serious case.  That child, he had a lawyer before that was

17   representing him.  That lawyer is no longer involved in his

18   case.  So today, there's another lawyer that wanted to take

19   his case but that lawyer had -- what I'm trying to say that

20   this -- this lawyer that is assigned to my child --

21         THE COURT:  Which child?

22         DAD: (In English) he had different lawyers.  The

23   last one was Murad Mohammed, and Murad never visited him in

24   the jail.  And Mohamed doesn't know anything about this

25   case.  He just sit in jail and keep calling me, asking --

1          THE COURT:  Well, we're not talking about Mohamed.

2     We're talking about Adnan.

3          DAD: (In English) okay.  I just wanted to tell you

4     that that's what happened for Mohammed doesn't have lawyer

5     -- he has a lawyer but he doesn't cooperate for --

6          THE COURT:  Well, that's not this son.

7          DAD: (In English) okay.

8          THE COURT:  Now, do you understand --

9          DAD: (In English) yeah, I do understand -- --

10          THE COURT:  No, you let me finish.

11          DAD:  (In English)  Go ahead.

12          THE COURT:  You don't tell me when to go ahead.

13     Do you understand that?

14          DAD:  (In English) I'm sorry about that.  I don't

15     know the rules --

16          THE COURT:  Yes, you do.  You know respect, and

17     you respect me.

18          DAD: (In English) yes, Your Honor.  I'll respect

19     you.  I'll always respect you.

20          THE COURT:  Yes.  Let's get that right.  Now, you

21     saved your son's life.  Do you understand that?

22          DAD: (In English) yes, I do.

23          THE COURT:  Because if he had gotten that

24     passport, he would have been in Syria.

25          DAD: (In English) that's true.

1          THE COURT:  Do you understand that?

2          DAD: (In English) yes, I do.

3          THE COURT:  So whatever anger you may have about

4    him being here, he is alive.  Do you understand that?

5          DAD: (In English) yeah, I don't have any anger.

6    I'm happy, my boys, they arrive and they are here and I

7    appreciate for the government.  Also I say for Adnan, my

8    boys was misleaded.  If the government cooperated with us,

9    we were --

10         THE COURT:  Well, let's back up.  I don't want to

11   get in an argument with you about your kids.  You had a

12   conversation with your son.  He lied to you.  If the FBI had

13   come to you and said they're involved in something, you

14   would have gone to your sons and they would have said we're

15   not involved with it and you would have said the FBI is

16   harassing them.  So we're back to square one.  Your children

17   lied to you.

18         DAD: (In English) that's correct.

19         THE COURT:  And they lied to you about what they

20   believed and what they were going to do.

21         DAD: (In English) yes.

22         THE COURT:  And you have to accept that.

23         DAD: (In English) yeah, I will accept that.

24         THE COURT:  All right.  You may be seated.

25         DAD: (In English) thank you.  I appreciate it.

1          MOM: (In English) thank you so much.

2          THE COURT:  Step forward.  All right.

3          The Court will, of course, follow the factors

4    under Title 18, 3553(a) in sentencing the defendant, and my

5    sentencing memorandum will cover everything.  The defendant

6    is hereby sentenced to the care and custody of the Bureau of

7    Prisons for 120 months.  No fine is imposed.  The defendant

8    is sentenced to a term of 20 years of supervised release.

9          The following mandatory conditions are applicable:

10          The defendant must report to the United States

11    Probation and Pre-trial Services Office in the district to

12    which the defendant is released within 72 hours of release

13    from the custody of the Bureau of Prisons.

14          Next, defendant shall not commit any crimes,

15    federal, state, or local.

16          Next, mandatory drug testing is suspended based on

17    the Court's determination that the defendant poses a low

18    risk of future substance abuse.

19          Next, the defendant shall not possess a firearm,

20    ammunition, destructive device or other dangerous weapon.

21          Next, the defendant shall cooperate in the

22    collection of DNA as directed by the probation officer.

23          The defendant shall abide by the standard

24    conditions of supervised release that have been adopted by

25    the Court, including the following special conditions:

1              The defendant shall submit his person, residence,

2      office, vehicle, or other area under the defendant's control

3      to a search conducted by the United States probation officer

4      or supervised designee, at a reasonable time and in a

5      reasonable manner, based upon reasonable suspicion of

6      contraband or evidence of a supervision violation.  The

7      defendant shall warn all other residents or third parties

8      that the premises and areas under the defendant's control

9      may be subject to searches pursuant to this condition.

10             The defendant shall not possess or use computer or

11     have access to any on-line service without the prior

12     approval of the United States Probation and Pre-trial

13     Services Office.  The defendant's cooperation shall include,

14     but not be limited to, allowing installation of a computer

15     and internet monitoring program and/or identifying computer

16     systems, internet-capable devices, and similar memory and

17     electronic devices to which the defendant has access.

18             Monitoring may include random examinations of

19     computer systems along with internet, electronic, and media

20     storage devices under the defendant's control.  The computer

21     system or devices may be removed for a more thorough

22     examination if necessary.  The defendant shall contribute to

23     the costs of such monitoring services based on the

24     defendant's ability to pay as deemed appropriate by the

25     United States Probation and Pre-trial Services Office.

1    If not employed at a lawful occupation as deemed

2    appropriate by the probation officer, the defendant may be

3    required to perform up to 20 hours of community service per

4    week until employed.

5        The defendant may also participate in training,

6    counseling, daily job search or other employment-related

7    activities as directed by the probation officer.

8        Next, the defendant shall provide the probation

9    officer access to any requested financial information,

10   including credit reports, credit card bills, bank statements

11   and telephone bills.

12       Next, the defendant shall not possess, view --

13   possess, view, access or otherwise use material that

14   reflects extremist or terroristic views as deemed -- or as

15   deemed to be inappropriate by the United States Probation

16   Office.

17       The defendant shall participate in mental health

18   counseling program as approved by the probation officer.

19   The program may include psychological and psychiatric

20   counseling or treatment, family counseling or mentor

21   support.

22       The defendant must submit to periodic polygraph

23   testing at the direction of the probation officer as a means

24   to ensure compliance with requirements of supervision.

25       The defendant shall surrender his passport and any

1    travel documents that -- that -- and must not apply for a

2    new passport or travel documents.

3         The defendant shall reside for a period of up to

4    365 days in a residential re-entry center as approved by the

5    probation officer and shall observe the rules of that

6    facility which may include location monitoring with a global

7    positioning system technology, GPS.  The defendant may be

8    restricted to the residence at all times, except for

9    employment, education, religious services, medical,

10   substance abuse or mental health treatment, court

11   obligations, or discretionary activities as approved by the

12   probation officer.  The defendant shall not be required to

13   pay costs of the location monitoring.

14        And finally, there's a $100 special assessment

15   that has to be paid immediately to the crime victims fund.

16        Sir, you have a right to appeal my sentence to the

17   higher court, the appellate court, and that's the Eighth

18   Circuit Court of Appeals, and that court sits in St. Louis,

19   Missouri.  And I'm ordering counsel to file that notice of

20   appeal immediately so your appeal rights are preserved.

21   That notice gives the Eighth Circuit Court of Appeals notice

22   that you are going to appeal my sentence based on that you

23   feel that my sentence was illegal or violated the

24   Constitution.  Rest assured, I have no problems with that.

25   That's why I'm asking your counsel to file that notice of

1    appeal so your appeal rights are preserved so you can appeal

2    my sentence.

3              Now, is there anything further for the government?

4              MR. WINTER:  Your Honor, I don't think there are

5    any charges to dismiss.

6              I would just note for the record in response to

7    the parents' statement that the FBI met with the father

8    three times during the course of the conspiracy, three

9    separate times.

10             THE COURT:  Thank you.  Anything further for the

11   defense?

12             MR. UDOBIOK:  Your Honor, just, I'm sure the Court

13   knows that Mr. Farah's parents are not parties to this case

14   and whatever statement may have given --

15             THE COURT:  It's not --

16             MR. UDOBIOK:  Thank you, Your Honor.

17             THE COURT:  It's just --

18             MR. UDOBIOK:  Your Honor, and then do I -- do I

19   file the notice of appeal even if my client doesn't want it

20   filed?  I just want to get the Court's direction.

21             THE COURT:  Well, I want it filed and that gives

22   him time to think about it.  I don't want any rash

23   decisions.  He's got 14 days.  Once it's filed, and if he

24   doesn't want to appeal, you can petition the Court to

25   dismiss that appeal.

```
 1              MR. UDOBIOK:  Thank you, Your Honor.

 2              THE COURT:  But I don't want him to lose his

 3       appeal rights, and just because he says he doesn't want to

 4       appeal now and he waits until the 15th day, then he loses

 5       it, and so I don't want that to happen.

 6              Now, counsel.

 7              MR. UDOBIOK:  Yes, Your Honor.

 8              THE COURT:  It has been a honor having you before

 9       me.  You have upheld the highest standards of being an

10       attorney.  This has been a extremely difficult case for you

11       in many ways, and you've already expressed that.  And the

12       Court understands that and appreciates your advocacy and for

13       your client, and it has allowed him to not end up with a

14       conviction that carries a life sentence, and so you've made

15       me proud to be a lawyer.

16              MR. UDOBIOK:  Thank you, Your Honor.

17              THE COURT:  All right.  We'll recess.

18          (Proceedings concluded at 3:14 p.m.)

19

20                          *      *      *

21

22

23          I, Staci A. Heichert, certify that the foregoing is

24       a correct transcript from the record of proceedings in the

25       above-entitled matter.
```

1

2              Certified by:   *s/ Staci A. Heichert*

3                              Staci A. Heichert,
                               RDR, CRR, CRC

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25